## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DOMINION NUTRITION, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) No. 04 C 4902 |
| | ) Richard A. Posner, |
| | ) Circuit Judge, |
| | ) sitting by designation |
| v. | ) |
| | ) |
| | ) |
| RAYMOND CESCA, | ) |
| | ) |
| *Defendant.* | ) |

## OPINION

This intriguing commercial case began with the filing in July of 2004 of a complaint by Dominion Nutrition, Inc. (DNI), charging the defendant, Raymond Cesca, DNI's former chief executive officer, with breach of contract, breach of fiduciary duty, intentional interference with advantageous business relations, and usurpation of a corporate opportunity. Federal jurisdiction is based on diversity of citizenship, DNI being a citizen of Delaware and Idaho, Cesca a citizen of Illinois, and the amount in controversy in excess of $75,000 exclusive of interest and costs (DNI seeks compensatory damages of more than $20 million plus punitive damages in an unspecified amount). The parties have agreed that Illinois law governs the substantive issues, though at the end of this opinion I question one aspect of the agreement. I was assigned to preside over the trial, which, initially, was to a jury. The trial began on December 11,

2006, and the parties rested on December 14. I then discharged the jury, for reasons I'll explain shortly.

Ronald Achs, DNI's founder, majority shareholder, and chief executive officer except during Cesca's brief occupancy of that position, was for many years a trader of currency futures on the Chicago Mercantile Exchange. In the early 1990s he moved to Idaho and after several more years of trading financial futures from there he bought a 5,000-acre ranch. His plan was to develop it as a hog farm, but the plan fell through when the county refused to give him a permit to raise 100,000 hogs on the property. As a result of the debacle, he lost ownership of the property. But he remained in possession of it, and casting about for an alternative use for it he discovered that a company planning to build an ice cream plant nearby would be interested in buying butterfat. He toyed with the idea of transforming the ranch into a dairy farm that would contain, in addition to cows, a processing plant to separate the milk into various components, including the butterfat. If he sold just the butterfat of the milk produced by the cows, he would be left with skim milk that would, for some reason, not be marketable as skim milk. He did some research and discovered that skim milk can be filtered to produce a milk drink that is very high in protein and calcium and even lower in fat than ordinary skim milk. He thought this might be a commercial opportunity.

In the summer of 2002 he made contact with a large Danish company, APV, a subsidiary of an international conglomerate enterprise named Invensys plc. According to Invensys's home page, APV "supplies the food, beverage, personal care, pharmaceutical and industrial sectors with innovative products, process solutions and support services in 48 countries worldwide." Its "process solutions" include filtration processes for making raw milk into finished milk products. At Achs's request, APV created a flow chart called in the trade a "mass balance," detailing the sequence of steps by which milk would be converted into the high-protein milk product that Achs had conceived of and that the parties call "Hi-Pro." (I have appended a copy of the mass balance to this opinion.) Apparently it differed from any other milk product that had been marketed in the United

States. A central issue in the trial was whether Achs had invented the process for making Hi-Pro and APV had merely inserted the information he gave it into the mass balance or whether, as Michael Francis—who was the chief of a North American division of APV and was the APV executive who worked with Achs—testified, Achs had merely told APV what he wanted to produce (the high-protein milk drink) and APV had devised the process for producing the product from raw milk.

At this point I interrupt the narrative to explain the discharge of the jury, and the sequel to that untoward development. Achs has a limited scientific background. He was a premed for part of his college career, but until he became interested in hog farming he had been a trader of currency futures and until the Hi-Pro project he had had no involvement in the dairy industry. He testified that he developed the process for making Hi-Pro by doing research on the Internet, but he has no downloads or documents to substantiate the claim. In an effort to bolster his claim to have been the inventor of the process he testified on direct examination that "from the commodity days, trading and everything else, I knew about proteins, and casein was a protein. It's found in milk."

This testimony was given early in the trial, and shortly afterward the courtroom deputy informed me that one of the jurors wanted to speak to me in private. I cleared the courtroom of all but the reporter and court personnel, and questioned the juror. The reporter recorded the interview but placed the record of it in camera, as I directed. I have since ordered it made a part of the public record.

The juror in question was himself a trader of financial futures, on the Chicago Board of Trade (recently purchased by the Chicago Mercantile Exchange), and he said that he had a serious problem with Achs's credibility but that he didn't know whether he had to keep it to himself or whether he could share his concern with the other jurors. He said that financial futures and commodity futures are completely different animals and that Achs had tried to blur the difference in order to bolster his claim to have sufficient agricultural expertise to have invented

a process for making such a product. I told him that a juror is
free to base an opinion of the truthfulness of a witness's testi-
mony on the juror's professional experience, and to share that
opinion with the other jurors—but only at the end of the case,
when the jurors retire to deliberate. I reminded him, as I had
instructed the jury (and I repeated the instruction every time
the jury left the courtroom for a recess or at the end of the day),
that he could not discuss the case with the other jurors until it
came time to deliberate. I also suggested that he reserve judg-
ment about Achs's testimony because the trial had just begun
and he would be hearing from other witnesses and he might be
skeptical about their testimony too. In fact I thought but did
not say that he was making a mountain out of a molehill. Achs
had not claimed to have traded agricultural commodity futures,
and it was not implausible that in many years of trading finan-
cial futures he had learned something about commodity futures
and perhaps even about the commodities themselves. Financial
futures are very similar to futures contracts in pork bellies and
other agricultural commodities, including milk, and are often
traded on the same exchanges and are regulated along with
commodities futures by the Commodity Futures Trading Com-
mission.

Trial resumed and that afternoon there was another inci-
dent involving this juror. After a sidebar, and with the jury
having taken a recess, Achs, who had been sitting in the wit-
ness box during the sidebar, said that he had overheard this
juror, whom I'll call A, and the juror sitting on his immediate
right (B) discussing the case and calling it "bullshit." Again I
interviewed juror A, this time in open court. He admitted hav-
ing spoken with B during the sidebar but said that all he'd said
was that the lawyers should resolve their dispute by arm wres-
tling, apparently an allusion to the television program *Boston
Legal*. In the light of his emphatic denial of Achs's account, I
decided to let him remain on the jury.

The third and critical incident involving the jury occurred
the next day. Achs had been recalled to the stand and was be-
ing cross-examined by Cesca's lawyer, who at one point asked
Achs whether milk had been traded on the Board of Trade

when he was a trader there, and when he said "no" the lawyer followed up by asking (saying, really): "So, there's no way you're familiar with milk prices based on your experience as a commodities trader. Is there?" And Achs replied, "No, that's incorrect, counsel." The lawyer then changed the subject. But during this exchange, recalling the juror's preoccupation with Achs's lack of experience trading agricultural commodities, I glanced over at the jury and saw juror B, still sitting on A's immediate right, swivel toward A and smile or smirk. I did not notice A's reaction, but my law clerks, who corroborated my observation, told me they'd seen A nod emphatically in response to B. Apparently no one else in the courtroom observed the incident.

I immediately inferred that A had told B that he didn't believe that Achs could have learned about agricultural commodities at his time at the Board of Trade. Such a discussion would have been a serious breach of propriety, less because these two jurors had disobeyed my instruction that the jurors not discuss the case until they retired to deliberate than because juror A had caused the bee in his bonnet about Achs's credibility to buzz about inside the head of another juror (maybe more than one other juror)—had in all likelihood enlisted that juror in his campaign to brand Achs a liar. I did not think it possible in these circumstances for DNI to get a fair trial from this jury.

At this point the trial was almost over, so I let it finish, and after the two sides rested I laid the problem before the lawyers and asked them what they thought I should do. Cesca's lawyer, naturally, wanted me to do nothing. DNI's lawyer suggested that I discharge the jury and decide the case myself, as if it had been a bench trial. This was a feasible solution because I had paid close attention to the testimony and had read the exhibits as they were introduced. I toyed with the idea of discharging the two errant jurors and voir diring the others (with two gone, there would still be a quorum of six jurors). Had this been a three-month trial threatened with derailment on the eve of completion, I might have done that. But it was only a three and a half day trial, and repeating it would have been preferable to distracting the remaining jurors from their duty as jurors by subjecting them to a potentially embarrassing voir dire.

That left it up to Cesca's lawyer to decide whether to have another jury trial or to convert the trial just completed to a bench trial, and he decided that like his opponent he preferred the latter course. What follows therefore are my Rule 52(a) findings of fact (besides those that I recited before interrupting my narrative) and conclusions of law. I ignore some details, simplifying the presentation where it is possible to do so without distorting the material facts.

For Achs to go forward with the Hi-Pro project, he not only needed a process; he needed a milk supply, money, a design for a factory that would use the process to produce Hi-Pro, the factory itself (which, equipped, would require the most money, and which he planned to erect on the ranch property), the processing equipment that would have to be installed in the factory (including filtration membranes supplied by APV or some other food processing technology company), and customers. He assembled a team to cover all these bases. A large dairy farmer in Idaho named Ron Aardema agreed to supply the milk and the money; Achs had little money of his own, having lost the ranch because of the failure of the hog venture. A food scientist named Tom Myers would supply the expertise necessary to ensure that Hi-Pro was properly flavored and otherwise palatable. APV would supply the filtration membranes and other processing equipment for the factory, which would be built by a local builder named Ricky Lee Anderson. Finally (because I ignore some bit players who made modest investments in the project), there was Raymond Cesca to provide the essential customer contact. Cesca, a consultant to the food industry, had recently retired from McDonald's, where he had had a long career in food supply. He had both managerial experience and excellent contacts with McDonald's that he could use to get Hi-Pro's foot in the door, so to speak. Achs never envisaged selling Hi-Pro other than through large restaurant chains, such as McDonald's.

Cesca signed on as a consultant to Achs's project, executing a standard confidentiality (nondisclosure) agreement. That was in the summer of 2003. The enterprise was organized at that time as a limited liability company named Dominion Process-

ing, LLC (DP). Achs, Aardema, and Myers were the members of
DP (an LLC's members are the equivalent of a corporation's
shareholders). Cesca was not, but he was appointed to DP's
managing board. The agreement establishing DP entitled
Aardema, the financier of the project, to withdraw on 60 days
notice, at his sole discretion. If he did, the agreement recited,
DP would be dissolved and Aardema would receive any of the
company's physical assets (as it turned out, there would be
none when he withdrew except a laptop computer and a box of
unidentified documents), because they would have been bought
with his money. Achs would take back the intellectual property,
namely the Hi-Pro mass balance, that he had contributed to the
enterprise.

Between the summer of 2003 and November of that year,
Aardema invested more than $600,000 in DP, and whether he
was dissatisfied with how Achs used the money, or had some
ulterior motive (he did not testify), he decided to pull the plug
on DP by invoking the provision that entitled him to withdraw
and by doing so cause DP to be dissolved. This placed Achs in a
severe money bind. But he decided to forge ahead. The other
participants in DP stuck by him—for the time being, at any
rate. Achs formed DNI, with himself as the majority share-
holder, to carry on. Cesca remained a consultant, though he
failed to sign a new nondisclosure agreement.

Through Cesca's good offices, the idea for Hi-Pro (not the
product itself—it had not yet been produced) was submitted to
the McDonald's "menu management" team, and cleared that
first hurdle to obtaining a contract, though, oddly, DNI failed to
sign the contract proposed by McDonald's in December 2003
that specified the further evaluations required before McDon-
ald's would approve a product for sale to the Mcdonald's restau-
rants. In January 2004, Cesca was able to persuade several
McDonald's executives to accompany him on a visit to APV's
plant in Denmark. The next steps, constituting the rest of the
McDonald's process for evaluating a new product, would have
been, first, to submit the product to a McDonald's focus group;
then, if it found favor with the group, to submit it to a McDon-
ald's "management taste test"; if it passed that test, to do a

statewide test marketing; and if that was a success, a national
and perhaps eventually a global rollout would ensue. The date
envisaged by McDonald's for a presentatioin to the focus group
was still several weeks away when on February 10 Cesca was
appointed chairman and president (effectively, CEO) of DNI.
Among the terms of his employment, he was entitled to 2 per-
cent of any profit that DNI obtained from the sale of Hi-Pro; he
also purchased for a nominal amount or was given about 15
percent of the common stock of DNI.

He resigned abruptly on March 1, after only three weeks as
DNI's CEO. His right to resign is not in question. And he had
not signed a noncompete clause. But he and Achs surely in-
tended the nondisclosure agreement that Cesca had signed
with DP to carry over to DNI. The agreement was by its terms
assignable without the consent of both parties "to a successor in
interest to all or substantially all of the stock, assets or busi-
ness of that party." DNI was that successor because DP had no
significant physical assets for Aardema to take with him when
that company was dissolved. It would have been ridiculous if,
as Cesca argues, Aardema had gotten Cesca's nondisclosure
agreement as part of the dissolution of DP; the agreement could
have value only to Achs, as the owner of the intellectual prop-
erty. There was no formal assignment, but I find that this was
an oversight and that DNI was entitled to enforce the assign-
ment against Cesca. However, there is no credible evidence that
Cesca has ever told anyone anything about DNI or DP that the
recipient of the information didn't already know *and* that was
at once confidential and consequential. He may have disclosed
to Aardema or Myers some cost estimates for producing Hi-Pro
that Achs had supplied him with, but these estimates could not
have had any value because Achs's knowledge of the economics
of milk production was extremely limited, indeed negligible. He
had no experience with such production, indeed with produc-
tion of any kind. He fancied himself an inventor, a financier,
and a promoter, not a hands-on operator, least of all in a busi-
ness with which he had no experience. I find that Cesca, al-
though bound by the nondisclosure agreement, did not violate
it.

The substantial questions that must be answered relate to DNI's tort claims and concern Cesca's behavior immediately before and after his resignation. Did he breach his fiduciary duty to DNI as its chief executive officer, intentionally interfere with a budding relationship between DNI and McDonald's, or appropriate a corporate opportunity—the opportunity to sell Hi-Pro to McDonald's—that belonged to DNI as his former employer? The facts required to establish any of these theories of liability are essentially the same. I shall first sketch the positions of the two parties, indicating the evidence offered to prove each.

DNI contends that Cesca, Aardema, Francis (the APV executive with whom Achs and Cesca dealt), and Myers all believed that Hi-Pro had terrific potential. But they saw Achs as dispensable at best and as a liability at worst. They decided to cut him out of the bonanza they envisaged. (Bear in mind that at this point I am just summarizing the parties' contentions.) So first Aardema pulled the plug. Then, early in January of 2004, Francis took Cesca and Myers, along with a couple of APV executives involved in the Hi-Pro project, on a fishing trip in the Bahamas to which he did not invite Achs. DNI speculates that the purpose of the trip was to provide an occasion for the participants to scheme against Achs. Then Francis sent DNI a bogus bill for $465,000, knowing that DNI, its money man having defected, could not pay it, and intending to use that nonpayment as an excuse for refusing to cooperate further with DNI in getting its process to the implementation stage. And in the most unkindest cut of all, Francis pretended that the Hi-Pro process was the property of APV—that Achs had stolen it. Francis used the pretense as a further excuse for severing relations with DNI. That in turn gave Cesca the excuse he needed to quit (not that he needed an excuse) on the dual grounds that with APV out and no money, the project was hopeless. And the pretext he needed to kill any chance that DNI might still have to sell Hi-Pro to McDonald's, by tipping off McDonald's that DNI was trying to steal APV's proprietary process. By doing this, Cesca cleared the way to resume the project outside of DNI. He made no effort to verify that APV rather than DNI owned the process, to seek another source of the required mi-

crofiltration technology (and there were a number of possible sources) to replace APV's technology, or to seek alternative sources of financing. After Cesca's defection, and right up to the trial, DNI has continued to seek financing, technology, and customers, and Achs and its other principals believe that they're on the brink of success at long last.

The very day he quit, Cesca sent an email to Tom Myers discussing possible enterprise structures for carrying on the Hi-Pro project outside of DNI. In the following days and weeks, Cesca was in continuous email communication with Francis and Myers (and also with a new player on the scene, Brad Barnhorn, another dairy consultant), talking up Hi-Pro and suggesting, much as in the March 1 email to Myers, ways in which the Hi-Pro project might be salvaged and a McDonald's contract landed. Cesca arranged a meeting between Barnhorn and McDonald's executives concerning Hi-Pro, and Barnhorn and Myers formed with Aardema a new company, Global Nutrifoods, LLC (GNF), that sought in effect to reconstitute DNI minus Achs. Cesca sent an email to Myers in April which asked "How can we assure *our* customers that no one is doing the same thing that *we* are doing?... We need to have a realistic answer to this question.... Do *we* need to do a technology search?" (Emphases added.) Cesca submitted a proposed consulting agreement to GNF, and the company's promotional materials listed him (he says without his knowledge) as an officer of the new company. APV had prepared samples of Hi-Pro for submission to McDonald's, but refused to ship them to DNI when it broke off relations with DNI; Cesca endeavored to have the samples shipped to McDonald's (unsuccessfully, because they spoiled while awaiting clearance by customs) so that he could assist GNF in obtaining the contract that DNI had sought.

The filing of this lawsuit in mid-2004 apparently froze further efforts by GNF to push the Hi-Pro project, and there is no indication that Cesca has ever received any money from GNF, except that he acknowledged that his legal expenses in this litigation are being fully reimbursed. He testified implausibly that he does not know by whom; it is probably Aardema, or someone

else connected with GNF, or GNF itself. Cesca did testify that he would not be surprised to learn that Aardema is the angel.

Cesca paints a starkly different picture of the facts, conceding only the innocuous elements in DNI's narrative. He acknowledges having been enthusiastic about DP's prospects, but points out that Aardema's defection was a terrible blow. Without money DNI could not build a factory to produce Hi-Pro, and without production it could not meet McDonald's deadlines for the various stages to rollout. Aardema had also been expected to supply the raw milk for the enterprise, as Achs never actually converted his (former) ranch to a dairy farm, though the fact that Cesca signed on as CEO of DNI after Aardema's defection shows that he thought the loss of Aardema's money and milk could be overcome. (In fact the loss of the milk was overcome, but not the loss of the money.) It was when they lost APV that Cesca lost all hope. He argues that there is no evidence that APV's bill was bogus, denies that there was any plotting during the fishing trip, and explains that he was persuaded that Achs had stolen APV's proprietary process rather than vice versa not only by what Francis said but by what he saw when he visited the Danish plant. Francis was irate when he learned that Achs had told California Dairies, Inc. (CDI), a major dairy enterprise and customer of APV, that DNI owned the process for making Hi-Pro. Cesca told Achs that unless he retracted that claim forthwith, all would be lost, and Achs complied—while at the same filing patent applications that claimed the process. Cesca explains his post-resignation emails as attempts to salvage a worthwhile project (the spin he gives is to deny any personal pecuniary motive to salvage it) after it was clear beyond any possible doubt that DNI could not land a contract with McDonald's. It had no money to build a factory and, since APV had severed relations with it, no source of filtration equipment. Thus there was no corporate opportunity to usurp, because there was no corporate opportunity. There was no advantageous business relationship between DNI and McDonald's to interfere with because the two had no relationship. There was no breach of fiduciary duty because there was nothing that

Cesca could have done to salvage DNI. And Cesca has not profited from any of the conduct of which DNI complains.

DNI's version of the facts, though it has a bit of a paranoid flavor, is not entirely groundless. I do think the fishing trip is rather suspicious, as Francis testified that he invited other customers as well as Cesca and Myers on the trip, yet in the end only those two plus Francis himself and other APV executives involved with the Hi-Pro project went on the trip, and it seems odd that Francis should have lavished such attention on a tiny start-up if there was no ulterior motive. I also thought curious Francis's testimony that he discouraged Achs from trying to patent Hi-Pro (the product, not the process—a critical distinction, which I take up shortly) because the filing of a patent application would compress the 18-month lead time that Francis thought a competitor would need to match the product, by giving the competitor information that would enable him to invent around the Hi-Pro product. The oddity lies in the fact that a patent application is secret for the first 18 months after it is filed. I also think that Cesca understated his interest in participating with GNF in a revival of the Hi-Pro project under new, Achs-free auspices. I do not believe his testimony that he did not know that the product GNF wanted to make was Hi-Pro.

But it is the rare case that goes to trial in which all the believable evidence is on one side. DNI's version of the facts has more serious flaws that Cesca's, flaws that cumulatively are fatal; and the final stake in DNI's heart is that DNI is the plaintiff and has therefore the burden of proof.

I do not credit the contention that the bill that Francis sent DNI was bogus. No evidence to that effect was presented, though it easily could have been by an expert witness knowledgeable about milk processing; and I think it highly unlikely that Francis, a young middle manager in a huge and, as far as anyone has suggested, entirely reputable international corporation, would take it upon himself to perpetrate such a fraud or that his superiors would encourage or condone such conduct. The mysterious Aardema appears to have had and still have an interest in pursuing the Hi-Pro project under the auspices of

GNF (which by the way is a defendant, along with Aardema and Myers, in a suit much like this one that DNI has filed in Utah and that is scheduled to go to trial in March). But there is no evidence that he pulled the plug on DP for any reason other than unhappiness with how Achs was spending his money.

I do not credit Achs's testimony that he invented the process for making Hi-Pro. The mass balance—one copy of which bears APV's name—is not the work of an amateur. Achs's testimony did not reveal the depth of knowledge of dairy technology reflected in the mass balance, and it is highly unlikely that he could have obtained such knowledge, with no background in dairy or food technology, from casually surfing the Web. (He testified that he invented the process in a couple of weeks, working only a few hours a day.) The absence of any documentation of his research is highly suspicious. He said he downloaded the results of the research from the Web and placed them in the "Favorites" folder on his computer, but, if so, he could have printed out the files in the folder and submitted them as evidence at the trial, and he did not do so. He implied that he had dictated the information used to create the mass balance in telephone conversations with Francis, and it is both inconceivable that technical information of that character and quantity would have been conveyed in this fashion and highly improbable that he would have made no record of so crucial a stage of the invention.

All this is not to say that Achs consciously appropriated APV's process. He may lack a clear idea of the differences between an idea and an invention, between a concept and a process, or between a process and a product.

Another possibility is that no one owns the process; that it is in the public domain. It is odd that the mass balance that carries APV's name merely says that it was "prepared" by APV and is not stamped proprietary. APV may have thought such a step unnecessary because it had extracted a nondisclosure agreement from DNI. But in addition APV has publicized its "Pro-Frac" process for concentrating the proteins in milk through successive stages of filtration and other processing, and the description and format of the process are similar to

those of the mass balance. The Pro-Frac process is not patented, and, being publicized by its inventor, cannot be a trade secret either. Nor is there any other basis on which it might be thought proprietary; there is no claim, for example, that the use of it to create a mass balance would be a copyright infringement. So there could be no basis for characterizing the use of it by DNI as "stealing" from APV. But because Pro-Frac is not proprietary, for DNI to equate it to the mass balance yet claim the latter as property of DNI is an awkward move for DNI to make, especially since, after APV complained that DNI was stealing its process, Achs, as I said, began filing patent applications (which remain pending) that claim the process as well as the Hi-Pro product itself.

I come to rest on the fact that Francis testified convincingly that the differences between the mass balance and Pro-Frac are sufficient to preserve APV's proprietary rights to the former. A comparison of the two documents corroborates his testimony. And the fact that APV extracted from DNI an agreement not to disclose any proprietary information of APV is sufficient evidence that APV took reasonable measure to protect the information, which is a prerequisite to legal protection of information as a trade secret. Moreover, unless Francis really was conspiring with Cesca and the future principals of GNF to appropriate DNI's intellectual property and commercial prospects—which I do not believe—it is not critical whether he and the lawyers he consulted at APV were right in thinking that APV had proprietary rights in the mass balance. Neither Francis nor APV is a defendant, and if APV was overclaiming, this cannot be laid at Cesca's feet unless, as DNI contends but I reject (see below), he failed to verify APV's claim. Even then, it would be most unlikely that McDonald's would want to get into a fight with APV, a major player in the global food-processing industry, by forging ahead with the tiny, unknown DNI.

If, as I find, Achs misrepresented to CDI that he owned a process in fact owned by APV, there is no longer any basis for thinking Francis a participant in a conspiracy to extrude Achs from a lucrative project (nor was any motive ever assigned for Francis's joining such a conspiracy), or for thinking that Cesca

merely pretended to believe that Achs had stolen APV's process, so that by forcing Achs to acknowledge the misrepresentation he could kill any chance of DNI's doing business with McDonald's. The misrepresentation was a terrible mistake on Achs's part, and gives credence to testimony by Anderson and others that Achs, though intelligent, creative (a "visionary," as he and others refer to him), ambitious, and likable, has significant weaknesses as an entrepreneur. It helps to explain why Aardema pulled the plug on DP.

But Cesca's post-resignation emails, the consulting agreement he submitted to GNF, and the payment of what must be his not inconsiderable legal expenses by or on behalf of GNF convince me that he hoped to participate actively and to his financial benefit in GNF's effort to resuscitate the Hi-Pro project; recall how in an email relating to the efforts of Barnhorn and others to carry on the Hi-Pro project, Cesca referred to "our customers." He may still be harboring a hope of future participation in GNF—why else is Aardema or perhaps GNF itself paying his legal fees? He denied having harbored hopes of carrying on the Hi-Pro project without Achs and DNI, but unconvincingly—and also unnecessarily. If DNI was dead in the water, there was no corporate opportunity to appropriate, and no breach of fiduciary duty in failing, during Cesca's few weeks as DNI's chief executive officer, to preserve the company's prospects—a hopeless undertaking. Hopeless for the further reason that the proposed (December 2003) contract between DNI and McDonald's (which though never signed set forth requirements that McDonald's would have been unlikely to waive for a company as small and new and unproven as DNI) made DNI responsible for all development costs associated with Hi-Pro—a commitment that DNI would have lacked the financial wherewithal to honor.

Even without a nondisclosure agreement, a fiduciary cannot by resigning obtain absolution from his breach of fiduciary duty before he resigned or (a form of such breach) use confidential information that he obtained before he resigned to compete with his former principal. *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. 1993). But Cesca did not commit a breach

of any of his fiduciary duties during his short stint as DNI's chief executive officer, and he told GNF's organizers nothing of value that they didn't know already. For they (all but Barnhorn) had been key players in DP; Aardema had been a principal of DP and Myers the company's food scientist. Cesca, since he did not control Aardema, Myers, or anyone else, including Francis, cannot be faulted for what they did or what they may do in the future with what they learned from their involvement with DP, to which Cesca was merely a consultant.

DNI points out that the nondisclosure agreement forbade the "use" as well as disclosure of confidential information. That would cover a case in which Cesca set out to compete with DNI using what he had learned about Hi-Pro's prospects but without sharing that knowledge with his associates in the venture. But that is not this case.

Of course it is no defense to a theft or other misappropriation that the thing misappropriated (which could be an expectancy rather than an actual property right, *Comedy Cottage, Inc. v. Berk*, 495 N.E.2d 1006, 1011 (Ill. App. 1986)), is worth more to the thief than to its legitimate owner. And so "when a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or it had no expectancy in the project." *Graham v. Mimms*, 444 N.E.2d 549, 557 (Ill. App. 1982). But Cesca took nothing of any value from DNI. And he was free to compete with DNI as long as didn't use confidential information in that competition. He was bound to serve DNI loyally, but only until he quit. He had no obligation to continue as chief executive officer and help Achs pick up the fragments of his shattered dream and glue them back together again. And, to repeat, no obligation to stay out of the high-protein milk business.

DNI argues that, at the very least, Cesca's fiduciary status required him to try to verify APV's claim of ownership of the Hi-Pro process, rather than take the claim at face value, without careful investigation. In an email to Myers on April 14,

2004, Cesca said: "I know that Michael [Francis] has always said to us that no one is doing it but I believe we need more than just his say so. Do we need to do a technology search?" But the argument gets DNI nowhere, because I have found that APV *did* own the process, so that a technology search by Cesca would merely have confirmed his belief. In any event, he did enough. He knew that APV was in the business of designing processes for making milk products and that Achs had no background in that business. It would have seemed odd, not to mention offensive, for Cesca to have questioned Francis's claim that APV had designed the Hi-Pro process. And how could he have verified the claim? Cesca is not a scientist or an engineer, and DNI had no money to hire a law firm or a consulting firm to investigate the bona fides of APV's claim—a step that in any event would not have contributed to repairing the severed relations between APV and DNI. Nor is it remotely realistic to suppose that during his three weeks as chief executive officer of DNI, Cesca should have lined up alternative financing or alternative technology.

There is a further point. Cesca is a consultant to the food industry. His relationship with McDonald's is one of his assets as a consultant, since McDonald's is such a large purchaser of food products. If McDonald's thought Cesca complicit in a theft of intellectual property from APV, a major player in the food-processing industry, it would no longer welcome him as a sponsor or introducer of potential suppliers of McDonald's food needs. Cesca had some right to protect his consulting business by disassociating himself from Achs's misrepresentation. There is a doctrine of commercial self-defense, reflected in the various self-help remedies such as repossession and forfeiture. *Chrysler Credit Corp. v. Koontz*, 661 N.E.2d 1171, 1173 (Ill. App. 1996); *Schlumberger Technology Corp. v. Blaker*, 859 F.2d 512, 515 (7th Cir. 1988); *Anastasia v. Cosmopolitan National Bank*, 527 F.2d 150, 157–58 and n. 18 (7th Cir. 1975); *Arcoren v. Peters*, 829 F.2d 671, 674 (8th Cir. 1987) (en banc). It does not extend so far as to authorize a fiduciary to commit a breach of his fiduciary duty—thus putting his interests ahead of that of his principal (the essence of fiduciary duty being that the fiduciary

must treat his principal as if it were himself), e.g, *Burg v. Ruby Drilling Co.*, 783 P.2d 144, 154 (Wyo. 1989) (concurring opinion); *In re Francisco*, 204 B.R. 247, 249 (Bankr. M.D. Fla. 1996)—but Cesca had no fiduciary duty to cover up what he reasonably and in fact correctly believed to be Achs's attempt to misappropriate APV's proprietary process. Cf. *Dyer v. SEC*, 291 F.2d 774, 778 (8th Cir. 1961).

In sum, I find that Cesca did not commit any legal wrong. But if he did, still there was no injury to DNI; and without an injury there is no tort. *Town of Thornton v. Winterhoff*, 92 N.E.2d 163, 166 (Ill. 1950); *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997); *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 155–56 (7th Cir. 1996). Injury is not required for a breach of contract. The victim of such a breach, even if not injured, is entitled to an award of nominal damages. *Hentze v. Unverfehrt*, 604 N.E.2d 536, 540 (Ill. App. 1992); *Restatement (Second) of Contracts* § 346 and comment b (1981). But there was no breach of contract (the only contract being Cesca's non-disclosure agreement that I have found was assigned by DP to DNI) because Cesca disclosed nothing of commercial value not known to the recipients of his disclosure.

DNI lost its chance for a contract with McDonald's not because of anything Cesca did or did not do, but because, at the critical time, DNI had no technology (APV having severed its relationship with DNI) and no money to go forward with the Hi-Pro project. (It had a promise of a milk supply, however, by California Dairies.) This is apparent from the fact that almost three years after Cesca's resignation, DNI still has not crossed the McDonald's threshold. DNI has raised some money and claims to have made great progress toward obtaining a substitute for APV's processing technology, but I am profoundly skeptical. DNI *still* has no plant (and even a plant usable only for test marketing would, according to the testimony at trial, cost $10 million, and a plant capable of full-scale production would cost at least $62 million), its net worth appears to be negligible, and it has only five employees other than Achs. Achs testified that he has raised considerable money since Cesca's resignation, but, if so—I am skeptical to the point of outright disbelief,

as there is no financial statement or other document to substantiate his testimony—virtually all the money has been spent. In any event, the length of time that DNI has taken to inch up to the threshold of success (if it has reached that threshold, which I flatly disbelieve, as there are no documents—letter of intent, for example—to indicate that DNI is about to sign contracts for the sale of Hi-Pro to anyone) shows that there was no chance of DNI's landing a contract with McDonald's in the winter or spring of 2004, as DNI contends it would have done had Cesca not abandoned ship and then interfered.

But if all this is wrong and there was both a violation of law and an injury to DNI, still DNI has made no serious effort to quantify the injury, so that at best it could obtain only an award of nominal damages on its tort claims for compensatory damages. The only evidence of damages that it presented was a revenue model of uncertain provenance and dubious admissibility that projected DNI's profits under a best-case analysis that showed it meeting a third of all McDonald's milk-product needs and obtaining total revenues from all customers of $1.5 billion a year. To get Hi-Pro into McDonald's stores, DNI would have had to clear a series of hurdles, as we know, beginning with the focus group. DNI presented no evidence concerning the likelihood that it would have cleared even the first of these hurdles, let alone all of them. No evidence, for example, of the percentage of all the products that the menu management team approves for submission to a focus group that end up in some or all McDonald's restaurants. No employee of McDonald's testified, perhaps because both sides hope to do business with McDonalds in the future, though in the case of DNI it probably is a forlorn hope, if only because of Achs's litigiousness. Nor was there any expert testimony. Or evidence that DNI could obtain the $10 million it would need to build a plant large enough to produce the amount of Hi-Pro required by McDonald's just for test marketing the product, a critical but of course not the only hurdle. DNI's entire staff, on the eve of Cesca's resignation, consisted of two persons besides Achs and Cesca, one

being Achs's lawyer and the other the creditor who took title to what had been Achs's ranch.

DNI's claim of compensatory damages is blocked at the threshold by the "new business" rule in force in a minority of states—including, however, Illinois. *Hill v. Brown*, 520 N.E.2d 1038, 1043 (Ill. App. 1988); *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995) (Illinois law); *Autotrol Corp. v. Continental Water Systems Corp.*, 918 F.2d 689, 694 (7th Cir. 1990) (same); see generally *MindGames, Inc. v. Western Publishing Co.*, 218 F.3d 652, 654–57 (7th Cir. 2000). But even if Illinois were among the states that reject the rule, such as Missouri, see *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892–94 (8th Cir. 2005), DNI's claim of damages would fail. Describing the majority rule, the *Restatement* says that "because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business." *Restatement (Second) of Torts* § 912 comment d (1979). "[A] start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate..., capitalizing fantasized earnings into a huge present value sought as damages .... Damages must be proved, and not just dreamed." *MindGames, Inc. v. Western Publishing Co., supra*, 218 F.3d at 658. When a start-up firm bases a claim of damages on a business opportunity that never materialized, it must show what the opportunity would have been worth had it materialized and it then must discount (multiply) that value by the probability that, had it not been for the defendant's alleged misconduct, the opportunity *would* have materialized. DNI has made no effort to do that. Any calculation of damages that I made would be arbitrary speculation—pure guesswork—which is impermissible. *Griffin v. Goldenhersh*, 752 N.E.2d 1232, 1238 (Ill. App. 2001); *Johnson Bank v. George Korbakes & Co.*, No. 05–3580, 2006 WL 3703003, at *4 (7th Cir. Dec. 18, 2006), and cases cited there.

If, moreover, DNI lost a real profit opportunity, Cesca's action in abandoning the company would not make any sense,

since he stood to profit handsomely from DNI's success. This is an additional reason to doubt both there was such an opportunity and that he acted wrongfully.

For completeness I note that if I found a tort violation but could not (and I could not, as I have just explained) award compensatory damages because of lack of proof, I would be required to award nominal damages provided that I found that the defendant's wrongdoing had been intentional. *Ainsworth v. Century Supply Co.*, 693 N.E.2d 510, 514 (Ill. App. 1998); see also *Giammanco v. Giammanco*, 625 N.E.2d 990, 997 (Ill. App. 1993); *Sanchez v. Clayton*, 877 P.2d 567, 573 (N.M. 1994). Nominal damages are not awarded for negligence, however. *Crosby v. City of Chicago*, 298 N.E.2d 719, 722 (Ill. App. 1973); *Jeffrey v. Chicago Transit Authority*, 185 N.E.2d 384, 386–89 (Ill. App. 1962); *Right v. Breen*, 890 A.2d 1287, 1293–94 (Conn. 2006). So if I thought Cesca's only misstep his failing to conduct a technology check, I could not award nominal damages. (I am speaking hypothetically; I have not found any wrongdoing on his part.)

The torts that Cesca is accused of committing have a strong intentional element, and if I found that he had committed any of them I would award DNI nominal damages and could then go on and award punitive damages as well if I found that Cesca had acted with reckless disregard of DNI's rights. *In re Estate of Hoellen*, 854 N.E.2d 774, 785–86 (Ill. App. 2006); *First National Bank of Des Plaines v. Amco Engineering Co.*, 335 N.E.2d 591, 593–94 (Ill. App. 1975); compare *Kemner v. Monsanto Co.*, 576 N.E.2d 1146, 1152–54 (Ill. App. 1991). But he did not. You can commit an intentional tort without malice in the sense of knowing that you are acting wrongfully or being recklessly indifferent to whether you are acting wrongfully or not. You can, for example, intentionally interfere with someone's contract believing mistakenly that you are privileged to do so. Given the evidence, Cesca was at the very worst careless or hasty in the discharge of his duties as chief executive officer of DNI and hopeful of salvaging some financial advantage from the wreck. Such conduct would not warrant an award of punitive damages. *Loitz v. Remington Arms Co.*, 563 N.E.2d 397,

401–02 (Ill. 1990); *Home Savings & Loan Ass'n v. Schneider*, 483 N.E.2d 1225, 1228 (Ill. 1985); *Europlast, Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1276–77 (7th Cir. 1993) (Illinois law); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.* 896 F.2d 1035, 1043 (7th Cir. 1990) (same). Nor restitution (anyway not sought), since Cesca did not profit from any of his alleged wrongdoing. He didn't even receive any salary or other compensation for his admittedly very brief service as DNI's chief executive officer. The reimbursement of his legal expenses could be a down payment, as it were, on future remuneration by GNF, but there is no actual evidence of that.

There is one last issue to resolve. In his post-trial brief Cesca requests an award of attorney's fees on the basis of a provision in his nondisclosure agreement with DP, which I have ruled was assigned to DNI, that states that "if either party brings an action to enforce the provisions of this Agreement, the prevailing party shall be entitled to its reasonable attorneys' fees and court costs." (This is arguing in the alternative with a vengeance, since Cesca denies that the agreement was assigned. But that's okay.) DNI's suit is, in part, a suit to enforce the agreement. Although it is difficult to think of any reason why such a contractual clause, made between commercially sophisticated parties, should not be enforced, the law in Illinois regarding its enforceability is murky. Some cases in the Illinois Appellate Court suggest that the trial judge has discretion whether to enforce such a fee-shifting clause or not, *Powers v. Rockford Stop-N-Go, Inc.,* 761 N.E.2d 237, 240 (Ill. App. 2001); *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger,* 726 N.E.2d 687, 694 (Ill. App. 2000), others that the prevailing party has a right to a fee. *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership,* 757 N.E.2d 1271, 1275–77 (Ill. App. 2001); *Midwest Concrete Products Co. v. La Salle National Bank,* 418 N.E.2d 988, 989–91 (Ill. App. 1981). But all the cases state or assume that the amount to be awarded is in the judge's discretion, and this opens up the possibility that the judge might award the prevailing party—nothing. The Supreme Court of Illinois has not weighed in on the issue.

   We have discussed the issue as one of Illinois law, because that is the only law that the parties have suggested is applicable to the issues in this case. Remarkably, Cesca fails to note that the nondisclosure agreement on which it bases its claim for attorney's fees states that it is governed by the law of Idaho, which may grant the trial judge even more discretion in enforcing a contractual fee-shifting provision than Illinois does. See Idaho R. Civ. P. 54 (e)(1); Jesse R. Walters, Jr., "A Primer for Awarding Attorney Fees in Idaho," 38 *Idaho L. Rev.* 1, 62–63, 66, 68 (2001). In fact, Cesca's entire argument for an award of fees consists of a quotation of the contractual fee-shifting provision of the nondisclosure agreement. He not only fails to specify the applicable law; he fails to specify a procedure for, or even affirm the feasibility of, apportioning the fees he has incurred between the defense of the contract claim and the defense of DNI's tort claims. So perfunctory a submission does not give a trial judge a basis for an exercise of his discretion, and for the further reason that Cesca, evasive at trial with regard to his fee arrangements, continues to be evasive. I referred above to "the fees he has incurred," but *he* has incurred no fees. They are being paid for by someone else—a someone else whose identity Cesca pretends not to know, but who may well be Aardema, whose role in the conduct of which DNI complains was never forthrightly explained at trial.

   Cesca has failed to justify an award of fees. I decline to award any, but I am entering a final judgment in his favor on all of DNI's claims.

*Richard A. Posner*
Circuit Judge

December 28, 2006

**Appendix: The Mass Balance**

